IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **RAYMOND V. BONEY,** | § | |
| Plaintiff, | § | |
| | § | |
| Vs. | § | Civil Action No. 4:19-cv-2594 |
| | § | |
| **TEXAS A&M UNIVERSITY,** | § | Jury Requested |
| Defendant. | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

**Introduction**

1. Defendant Texas A&M University ("TAMU") violated Title VII through its gender-stereotyping discrimination, sexual orientation discrimination, race discrimination, and retaliation against Plaintiff Raymond V. Boney ("Boney") resulting in Boney being subjected to different terms and conditions of employment, hostile work environment, and finally termination.

2. Boney brings claims directly against TAMU for its discrimination and retaliation against him in violation of Title VII during the actionable period, and seeks equitable relief, injunctive relief, actual damages, and attorney's fees and costs for those violations.

**Jurisdiction and Venue**

3. The Court has jurisdiction under 28 U.S.C. §1331 (federal question) and under 28 U.S.C. §1343 (civil rights).

4. The acts or omissions made the basis of this suit occurred in Brazos County, Texas and in this judicial district, so venue is proper in this Court under 28 U.S.C. §1391.

5. All required conditions precedent required under Title VII (42 U.S.C. §2000e et seq.) have been exhausted and/or performed by Boney prior to the filing of this complaint: 1) Boney filed a charge of discrimination and retaliation on or about December 6, 2017 (Boney's initial charge of discrimination was with the DOE, which then transferred it to the EEOC, but both the DOE and EEOC identified the original complaint as the date of the charge for purposes of Title VII), within 300 days of the date of some of the discriminatory and all of the retaliatory adverse actions, to include the termination that occurred on June 21, 2017, for which recovery is sought that is complained of herein; 2) the EEOC sent a Notice of Right to Sue on April 16, 2019.  Boney received the Notice of Right to Sue on April 20, 2019. See Exhibit A, which contains copies of Boney's charge documents and the Right to Sue letter.  Therefore, this suit is timely filed within the 90 days allowed from Boney's receipt of this right to sue letter.

## Parties

6. Boney is a citizen of the United States and resides in Washington, D.C.

7. Defendant TAMU is a state agency.  TAMU may be served through its President, Michael K. Young, at Office of the President, Jack K. Williams Administration Building, 1246 TAMU, Texas A&M University, College Station, TX 77843-1246.

## Statement of the Case

8. Boney alleges that as a result of him being African American, male, homosexual, or because he engaged in protected activities, Boney was illegally or disparately harassed, subjected to a pattern of pervasive harassment and disparate treatment, and knowingly subjected to different terms and conditions of employment and then terminated for a knowingly false reason.

**Plaintiff's Original Complaint**  2

9. Although Boney complained of discrimination against his supervisor, Amy Smith ("Smith"), beginning on April 6, 2017 and several times thereafter to include on June 12th and 19th, 2017, however TAMU took no action to investigate these complaints when they were made prior to TAMU's decision to terminate of Boney's employment, on June 21, 2017.

10. Following Boney's April 6, 2017 complaint of discrimination, TAMU moved Boney from reporting to Smith to reporting to Mr. Shane Hinckley ("Hinckley").

11. Hinckley reported directly to Smith.

12. This "move" of Boney, left Boney still under Smith's supervisory authority and control and therefore did not provide any relief to Boney or protection from potential retaliation from Smith.

13. Smith and Hinckley continued to treat Boney disparately through disregard of Boney's work and authority regarding his area of responsibility.

14. Boney tried to move away from Smith's supervision by requesting a transfer to another area of TAMU on June 12, 2017.

15. Boney never received any acknowledgement or action on his request to leave Smith's supervision.

16. After Boney suffered yet another act of disrespect and disregard from Smith and Hinckley, Boney communicated his complaint to Hinckley on June 19, 2017 indicating that he did not feel that he would be able to perform his duties under those conditions.

17. Boney specifically asked Hinckley what the penalty would be if he could not perform his duties under those circumstances.

18. Boney stated more than once to Hinckley that he was not refusing to do his job duties at that time.

19. Hinckley informed Boney that he did not know what disciplinary consequences would follow and that he would have to check with others; to include his supervisor Smith regarding what consequences would follow if Boney refused to perform his duties as assigned.

20. At the end of the meeting on June 19, 2017, Boney conveyed to Hinckley that he would be issuing a complaint of discrimination and retaliation.

21. Boney continued to perform his duties over the next two days without incident.

22. On the second day, June 21, 2017, Hinckley called Boney to a meeting.

23. At this meeting Hinckley did not inform Boney what he told Boney that he would find out; that is, what disciplinary action would be taken if Boney could or would not perform one of his duties as assigned.

24. Instead, Hinckley informed Boney that he had been fired for refusing to perform his duties as assigned.

25. No other reason was given for terminating Boney.

## Factual Allegations

26. Boney is African American, male, and homosexual.

27. Boney was qualified and able to perform his job duties at all times during his employment.

28. Boney is an Aggie, class of 1996.

29. Boney began working for TAMU on March 1, 2016 as its Director of University Events.

**Plaintiff's Original Complaint**                                                                                                   4

30. Boney had previous experience as an event planner in Washington, D.C. for the preceding seventeen years.

31. Boney performed his duties to the satisfaction of TAMU as reflected in communications received by Boney from TAMU representatives and through the absence of disciplinary documentation to the contrary.

32. The only disciplinary action issued to Boney during his 15 months of employment with TAMU was the termination letter dated June 21, 2017.

33. Boney's employment with TAMU began positively with multiple recognitions of Boney's positive performance from members of TAMU's administrative upper echelons; including the President's office.

34. On information and belief, Boney was the only homosexual African American male employee within his chain of command during the entire time he worked for TAMU.

35. Boney only began to have problems following the hiring of Smith on July 1, 2016 as Boney's division supervisor in the role of Senior Vice President over the Division of Marketing and Communications.

36. Smith would treat Boney differently than she treated all other employees.

37. For example, Smith would yell and curse at Boney when discussing details related to work.

38. After Smith lost her control following one meeting (about the event Aggies United on December 4, 2016), Smith stormed into Boney's office to discuss some issues that had been raised during the meeting and as she finished her tirade, Smith asked Boney, "do you want me to walk away and have you think that I'm a fucking bitch?"

39. Boney, shocked by this unprofessional and violent outburst, only responded, "those are your words, not mine."

40. Aggies United took place on December 6, 2016. Boney remained and continued to work despite this unwarranted, disrespectful, and violent treatment from Smith.

41. After Boney finished his duties regarding the Aggies United event, Boney allowed himself to react to Smith's mistreatment of him and Boney decided that he could not continue to work in such an unprofessional environment and therefore had to resign.

42. Boney turned in his resignation letter the next day on December 7, 2016.

43. Following his resignation, Boney had communications with multiple persons, to include the President's wife, Mrs. Marti Young, regarding his trouble working for Smith.

44. Mrs. Young personally requested that Boney allow her an opportunity to fix things with Smith, because she told Boney that she wanted to try to help fix the problem, "because, we like you."

45. On December 14, 2016, Smith came to Boney's office and asked Boney to stay, but Smith also told Boney that his having spoken to Mrs. Young "did not help your case."

46. Boney decided to let Smith's comment go and be the bigger person and stay as a favor to Mrs. Young and in service to the University as an Aggie.

47. Smith's harassment and disparate mistreatment of Boney continued to include but not necessarily be limited to the following incidents:

- January 9, 2017 – Smith told Boney that she was harder on Boney than her other direct reports,

- February 17, 2017 – Smith shouted at Boney to "cancel the fucking sign" regarding a SXSW event funding issue that Boney had raised with Smith to keep her apprised of the status of the project and also remain within the parameters that Smith had previously communicated to Boney,

- March 8, 2017 – Smith called an impromptu meeting in College Station regarding the upcoming SXSW event in Austin to discuss an additional invoice from Hotel Van Zandt for approximately $70,000.00. Smith was upset with the new invoice, referring to it as surprise expenses. However, Boney reminded her that he had informed her and the others that these expenses would be forthcoming and that it should not be considered a surprise since the contract clearly stated from the beginning that the initial amount contained in the contract only represented a minimums deposit to guarantee TAMU's hosting the event at that hotel. Smith responded to Boney with even more hostility and anger; yelling at Boney about these additional expenses. Boney responded in a raised voice to Smith's yelling at him and standing up to leave. Despite the fact that Smith had initiated the yelling and the anger, she told Boney to sit down stating that she felt threatened by Boney. Boney had made no threat or gesture toward Smith. Boney sat back down as instructed by Smith.

- April 3, 2017 – Smith verbally reprimanded Boney regarding her allegation that Boney had not provided an individual hotel room for a person (a white female), from over a month before. This reprimand came out of left field, since there had been no issue brought up by Smith to Boney with the hotel rooms since at least March 2nd when Boney informed Smith that her late requests for

reservation changes had been handled. That is, not only had Boney done as instructed by Smith under difficult circumstances, Boney had not been the cause of any issues related to the room reservations for this white woman or anyone else. Instead, the last minute request for reservation changes were made by Smith just the week before SXSW, which is a notoriously difficult time to obtain hotel reservations in Austin, and Boney was able to meet Smith's request without incident or complaint by Smith until unexplicably a month later.

- April 3, 2017 –Smith also criticized Boney for having informed a subordinate (another white woman) that she had violated protocol by disregarding Boney's position and authority to review and approve the language of a communication that Boney had originally drafted and the subordinate had altered without verifying with Boney first, and

- April 3, 2017 – as part of this meeting, Smith then advises Boney to consult with a career coach and that she could recommend an African American career coach to Boney that she knows out of Atlanta.

48. This became another incident where Smith went beyond professionally acceptable conduct given the direct and unnecessary reference to race by referencing the race of the Atlanta consultant.

49. Boney never mentioned that he required a career coach, nor did Boney ever mention that he required assistance with his career because he is black (or male or homosexual, for that matter).

50. As a result of this series of incidents, Boney felt that he had to speak out against the pattern of discrimination that appeared to establish that he was being treated differently

from the other employees for reasons that were not related to his work performance and instead appeared to be based upon illegal discriminatory motivations.

51. So on April 6, 2017, Boney called a meeting with Smith, Hinckley, HR Vice President, Barbara Abercrombie ("Abercrombie"), and HR Director of Organizational Consulting and Resolution Management, Wanda Boyd ("Boyd").

52. After Boney complained, the only action taken in response to Boney's complaints was to move Boney to report to Hinckley rather than to Smith, even though Boney would still be under Smith given that Hinckley reported directly to Smith.

53. The transfer did not actually occur until late April, no earlier than April 25, 2017.

54. On or about May 11, 2017, Hinckley met with Boney and issued his annual performance evaluation even though he had not supervised Boney for even a month at that time.

55. During this meeting, Hinckley told Boney that Boney was "different than what we are used to."

56. On June 6, 2017, Boney asked Hinckley to clarify what he meant by that comment, and Hinckley stated that he was referring to Boney's "personality."

57. Also during this same June 6, 2017 meeting, Hinckley reversed the position of TAMU to financially support a Houston Pride event (an event in support of LBGTQ communities and individuals) telling Boney that, "we have to distance the university president from controversy."

58. On June 12, 2017, Boney requested of Boyd, that Boney's position be permanently moved from marketing and communications given the failure of TAMU to reach any resolution following Boney's complaints of discrimination on April 6, 2017.

59. On June 19, 2017, Hinckley convened a meeting with himself, Boney, and Boyd to discuss a vendor issue and alleged conduct by Boney.

60. Prior to this meeting, Boney had directed that a vendor (a white woman) would not be included as a vendor at a follow-up/make-up event because the vendor had disregarded explicit instructions that the original event had been cancelled and would be rescheduled. Rather than following Boney's directions, the vendor went on TAMU campus and proceeded to take pictures and work as she was not authorized to do and had been instructed not to do.

61. Rather than back Boney in his decision to reprimand this vendor for the violations of his instructions and TAMU protocols, Smith and Hinckley told Boney that the white female vendor would not only be allowed to return to TAMU for the follow up event but she would also receive pay reimbursement for costs for both events.

62. Boney specifically told Hinckley that he did not think that he would be able to work with this vendor under the circumstances.

63. At no time did Boney tell Hinckley that he would not perform his duties as assigned: to include working with the vendor.

64. In fact, on more than one occasion, Boney affirmed to Hinckley that he was not refusing to perform his duties as assigned.

65. Boney told Hinckley that he would have trouble working with this vendor due to questions of morality associated with the circumstances surrounding working with that vendor.

66. These circumstances included the fact that this would be another instance in a consistent pattern of mistreatment from Smith where Boney was subjected to disregard and disrespect when Boney interacted with white women.

67. Instead, Boney asked Hinckley what consequences would follow if Boney did not work with this vendor.

68. Hinckley told Boney that he did not know, even though he was Boney's direct supervisor.

69. Hinckley told Boney that he would have to consult with others to include his supervisor (Smith).

70. Hinckley also told Boney that he would get back to Boney with the answer to this question.

71. At the end of this meeting, Boney informed Hinckley and Boyd, that Boney was going to widely and publically distribute his complaint of discrimination and retaliation.

72. Two days after the June 19th meeting, on June 21, 2017, rather than reporting to Boney what Hinckley found out about what consequences would follow if Boney did not perform his duties to include working with the white female vendor that had violated Boney's directions and TAMU protocol, Hinckley told Boney that he was terminated for insubordination for refusing to work.

73. TAMU has no credible evidence that Boney refused to work as assigned.

74. TAMU did not conduct an investigation.

75. TAMU either discriminated or retaliated against Boney by terminating him for false or contrived reasons in violation of its own policies and procedures.

76. Boney has diligently searched for replacement employment following TAMU's sudden and unjustified termination of his employment.

77. As a result of TAMU's adverse actions against Boney, he has had a difficult time obtaining replacement employment.

## Damages

78. Because of statutorily impermissible and willful, if not malicious, acts of TAMU and its representatives, Boney has suffered loss of income, loss of benefits, loss of career opportunity, loss of career investment, and loss of advancement pursuant to Title VII of the Civil Rights Act or 1964 and 1991, as amended and codified at 42 U.S.C. §2000e et seq. ("Title VII"). As a consequence of the unlawful and outrageous actions of TAMU, Boney has suffered humiliation, loss of standing in the community, emotional pain and suffering, inconvenience, loss of enjoyment of life, irritation and mental anguish. Boney seeks reinstatement, recovery, compensatory, and equitable (i.e., back pay and front pay) damages, as well as attorney's fees, and costs and pre and post judgment interest in the maximum amounts allowed by law pursuant to Title VII of the Civil Rights Act or 1964 and 1991, as amended and codified at 42 U.S.C. §2000e et seq. ("Title VII").

## Relief Requested

Paragraphs one (1) through seventy-eight (78) of this complaint are incorporated by reference and made a part of Relief One through Relief Five, inclusive.

## EQUITABLE RELIEF

### Relief One

Equitable and compensatory damages are the only means of securing adequate relief for Boney. Boney suffered, is now suffering, and will continue to suffer irreparable injury from the unlawful conduct by TAMU, as set forth herein until and unless enjoined by the Court, to include but not be limited to reinstatement with benefits returned, removing false or damaging information from Boney's personnel file, exonerating Boney for all misconduct that he was illegally and wrongly accused of having engaged, and allowing Boney to provide statements in rebuttal to any remaining documents within his personnel files. Title VII.

### Relief Two

Boney seeks awards of back pay and front pay for the loss of income as a result of the discriminatory and retaliatory based conduct, and termination by TAMU and its representatives during Boney's employment and as a result of Boney's negative experiences in that regard to include the unfair treatment and evaluation compared to other similarly situated employees that did not engage in protected activity. Title VII.

### Relief Three

Boney is entitled to awards of pre- and post-judgment interest on any amounts awarded to him. Title VII.

## LEGAL RELIEF

### Relief Four

Boney seeks compensatory, expectation, and/or consequential damages due to the illegal conduct of TAMU as alleged herein related to Boney's discrimination and retaliation claims. Title VII.

### Relief Five

Boney seeks attorney's fees, costs, and expert fees. Title VII.

### PRAYER FOR RELIEF

Boney requests the Court to cause TAMU, to be cited to appear and answer in this Court, and that upon final hearing, the Court grant to Boney as follows:

1. Grant Boney all equitable damages including reinstatement, back pay, front pay, and lost benefits;

2. Grant Boney compensatory damages for TAMU's acts of discrimination and retaliation against him;

3. Grant Boney pre and post-judgment interest in the highest lawful amount;

4. Grant Boney reasonable attorney's fees, together with his costs; and

5. Such other and further relief as the Court determines justice and equity so require.

Respectfully submitted,

**THE POERSCHKE LAW FIRM, PC**

/s/ Chris J. Ainsworth
**R. SCOTT POERSCHKE, JR.**
State Bar. No. 24067822
**CHRIS J. AINSWORTH**
State Bar. No. 24072789
5111 Center Street
Houston, Texas 77007
Phone 713.974.1600
Fax 713.621.2106
scott@rsplegal.com
ainsworth@rsplegal.com

/s/Robert S. Notzon
**The Law Office of Robert S. Notzon**
Texas Bar No. 00797934
1502 West Avenue
Austin, Texas 78701
(512) 474-7563
(512) 852-4788 facsimile

**ATTORNEYS FOR PLAINTIFF**